312/726-9550(Fax)
ARDC No. 02565994

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

IN RE:                                    )
    MCK SERVICES, INC.                    )          No. 09-73432
                                          )
              Debtor.          )

## NOTICE OF MOTION

To:    *See Attached Service List*

    YOU ARE HEREBY NOTIFIED that on October 28, 2009 at 9:30 a.m., or as soon thereafter as counsel may be heard, in Room 115 , petitioner shall then and there present the enclosed Motion for Relief from Stay and waive Rule 4001 (A)(3) before the Honorable Manuel Barbosa or any judge presiding in his stead at the United States Bankruptcy Court, 211 S. Court Street, Rockford, Illinois 61101.

You May Appear As You See Fit.

                                  By: _____
                                /s/    Robert M. Kamm, Its Attorney

## CERTIFICATE OF MAILING

    I, Robert M. Kamm, the undersigned attorney, certify that I served the foregoing Notice to the parties to whom it is addressed by placing a copy of same in the U.S. Mail at 17 North State Street, Chicago, Illinois 60602, at the hour of 5:00 p.m. on October_____, 2009, with proper postage prepaid.

                    _____
                    Robert M. Kamm

## Service List

Judge Manuel Barbosa
211 South Court Street
Room 115
Rockford, Illinois 61101

Mark E. Zaleski
10 North Galena Avenue
#220
Freeport, IL 61032

James E. Stevens
6833 Stalter Drive
Rockford, IL 61108

MCK Services, Inc.
P.O. Box 556
Freeport, IL 61032

MCK Services, Inc.
518 North 3rd Avenue
Freeport, Illinois 61032

Office of the U.S. Trustee
780 Regent Street, Suite 304
Madison, WI 53715

U.S. Bankruptcy Court
Northern District of Illinois
Western Division
211 South Court Street
Rockford, Illinois 61101

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

IN RE:                                        )
    MCK SERVICES, INC.                     )        No. 09-73432
                           )
          Debtor.                     )

### MOTION TO LIFT STAY

Fifth Third Bank by its attorneys, Kamm, Shapiro & Demuth, Ltd., and for its Motion for Relief from the Automatic Stay, states as follows:

1.      Fifth Third Bank is the owner and holder of two Notes executed by MCK Services, Inc. in the original principal amount of $800,000.00 and $40,000.00 respectively. True copes of the Notes are attached hereto, marked *Exhibit A and B* and made a part hereof.

2.      The balance due on Exhibit A was $798,124.14 and the balance due on Exhibit B was $24,518.41 on the date the Petition was filed.

3.      Fifth Third Bank has a security interest in business assets of the bankrupt including accounts receivable and equipment pursuant to a Security Agreement, a true copy of which is attached hereto as *Exhibit C* and made a part hereof.

4.      The security interest of Fifth Third Bank is a fully perfected and first lien on accounts receivable and non-titled equipment of bankrupt by virtue of a UCC-1 filed with the Illinois Secretary of State; a true copy of the Secretary of State records of UCC-1's filed against the bankrupt and the filing by Fifth Third Bank are attached hereto marked, *Exhibit D and E*, respectively and made a part hereof.

5.      The liquidation value of the Accounts Receivables and non-titled equipment is estimated at a total of $139,552.00.

6.    This is a Chapter 7 liquidation and the personal property of MCK Services, Inc.

is not required for future operations.

7.    Real estate collateral owned by Christine F. Kraft and Marlin Kraft and mortgaged

to Fifth Third Bank is after liquidation of accounts receivable and non-titled equipment not sufficient

to satisfy the indebtedness. Please refer to concurrent motion in 09-73434.

Wherefore, Fifth Third Bank prays for relief from the automatic so as to permit Fifth Third

Bank to collect accounts receivable and repossess and liquidate all non-titled equipment of MCK

Services, Inc. and apply the proceeds to the indebtedness of MCK Services, Inc. to it.

FIFTH THIRD BANK

By: _____
     Its Attorneys

Kamm, Shapiro & Demuth, Ltd.
17 North State Street
Suite 990
Chicago, Illinois 60602
312/726-9777(Phone)
312/726-9550(Fax)
ARDC No. 02565994

023 - FTCH

**🏦 Fifth Third Bank**

**Revolving Note**

OFFICER No. 09358
$800,000.00

NOTE No. _____-_____

July 3, 2007
(Effective Date)

1.  PROMISE TO PAY, On or before July 3, 2008 (the "Maturity Date"), the undersigned, MCK Services, Inc., an Illinois corporation located at 575 North Henderson Road, Freeport, Stephenson County, Illinois 61032 ("Borrower") for value received, hereby promises to pay to the order of Fifth Third Bank, a Michigan banking corporation located at 222 South Riverside Plaza, Chicago, Cook County, Illinois 60606 for itself and as agent for any affiliate of Fifth Third Bancorp (together with its successors and assigns, the "Lender") the sum of Eight Hundred Thousand and 00/100 Dollars ($800,000.00) (the "Borrowing"), plus interest as provided herein, less such amounts as shall have been repaid in accordance with this Note.  The outstanding balance of this Note shall appear on a supplemental bank record and is not necessarily the face amount of this Note, which record shall evidence the balance due pursuant to this Note at any time.

Principal and interest payments shall be initiated by Lender in accordance with the terms of this Note from Borrower's account through BillPayer 2000®. Borrower hereby authorizes Lender to initiate such payments from Borrower's account located at Fifth Third Bank, routing number 071923909 account number 7232238548.  Borrower acknowledges and agrees that use of BillPayer 2000® shall be governed by the BillPayer 2000® Terms and Conditions, a copy of which Borrower acknowledges receipt. Borrower further acknowledges and agrees to maintain payments hereunder through BillPayer 2000® throughout the term of this Note.  Each payment hereunder shall be applied first to advanced costs, charges and fees, then to accrued interest, and then to principal, which will be repaid in inverse chronological order of maturity.

Lender, in its reasonable discretion, may loan hereunder to Borrower on a revolving basis such amounts as may from time to time be requested by Borrower, provided that: (a) the aggregate principal amount borrowed hereunder at any time shall not exceed the Borrowing, and (b) no Event of Default shall exist or be caused thereby.  The entire principal balance, together with all accrued and unpaid interest and any other charges, advances and fees, if any, outstanding hereunder, shall be due and payable in full on the earlier of the Maturity Date or upon acceleration of this Note.

The principal sum outstanding shall bear interest at a floating rate per annum equal to 1.5% in excess of the rate of interest per annum established from time to time by Fifth Third Bank at its principal office as its "Prime Rate", whether or not Fifth Third Bank shall at times lend to borrowers at lower rates of interest or, if there is no such prime rate, then such other rate as may be substituted by Fifth Third Bank for the prime rate (the "Interest Rate").  In the event of a change in said Prime Rate, the Interest Rate shall be changed immediately to 1.5% in excess of such new Prime Rate.  Interest shall be calculated based on a 360-day year and charged for the actual number of days elapsed, and shall be payable on the 3rd day of each calendar month beginning on August 3, 2007.

Notwithstanding any provision to the contrary in this Note, in no event shall the interest rate charged on the Borrowing exceed the maximum rate of interest permitted under applicable state and/or federal usury law.  Any payment of interest that would be deemed unlawful under applicable law for any reason shall be deemed received on account of, and will automatically be applied to reduce, the principal sum outstanding and any other sums (other than interest) due and payable to Lender under this Note, and the provisions hereof shall be deemed amended to provide for the highest rate of interest permitted under applicable law.

2.  USE OF PROCEEDS,  Borrower certifies that the proceeds of this loan are to be used for business purposes.

3.  NOTE PROCESSING FEE,  Lender may charge, and Borrower agrees to pay on the above Effective Date, a note processing fee in the amount of $500.00.

4.  REPRESENTATIONS AND WARRANTIES, Borrower hereby warrants and represents to Lender the following:

PROMISSORY-NOTE © Fifth Third Bancorp 2001M (6/07)




EXHIBIT
A

63435-16-3-T.WHIT

20081218-167217

(a)    <u>Organization and Qualification.</u>  Borrower is duly organized, validly existing and in good standing under the laws of the State of its incorporation, has the power and authority to carry on its business and to enter into and perform all documents relating to this loan transaction, and is qualified and licensed to do business in each jurisdiction in which such qualification or licensing is required.  All information provided to Lender with respect to Borrower and its operations is true and correct.

(b)    <u>Due Authorization.</u>  The execution, delivery and performance by Borrower of the Loan Documents have been duly authorized by all necessary corporate action, and shall not contravene any law or any governmental rule or order binding on Borrower, or the articles of incorporation and code of regulations or by-laws of Borrower, nor violate any agreement or instrument by which Borrower is bound nor result in the creation of a Lien on any assets of Borrower except the Lien granted to Lender herein.  Borrower has duly executed and delivered to Lender the Loan Documents and they are valid and binding obligations of Borrower enforceable according to their respective terms, except as limited by equitable principles and by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.  No notice to, or consent by, any governmental body is needed in connection with this transaction.

(c)    <u>Litigation.</u>  There are no suits or proceedings pending or threatened against or affecting Borrower, and no proceedings before any governmental body are pending or threatened against Borrower except as otherwise specifically disclosed to Lender on or prior to the Effective Date or as set forth on any Litigation Exhibit which may be attached hereto.

(d)    <u>Business.</u>  Borrower is not a party to or subject to any agreement or restriction that may have a material adverse effect on Borrower's business, properties or prospects.  Borrower has all franchises, authorizations, patents, trademarks, copyrights and other rights necessary to advantageously conduct its business.  They are all in full force and effect and are not in known conflict with the rights of others.

(e)    <u>Licenses, etc.</u>  Borrower has obtained any and all licenses, permits, franchises, governmental authorizations, patents, trademarks, copyrights or other rights necessary for the ownership of its properties and the advantageous conduct of its business.  Borrower possesses adequate licenses, patents, patent applications, copyrights, trademarks, trademark applications, and trade names to continue to conduct its business as heretofore conducted by it, without any conflict with the rights of any other person or entity.  All of the foregoing are in full force and effect and none of the foregoing are in known conflict with the rights of others.

(f)    <u>Laws.</u>  Borrower is in material compliance with all laws, regulations, rulings, orders, injunctions, decrees, conditions or other requirements applicable to or imposed upon Borrower by any law or by any governmental authority, court or agency.

(g)    <u>Title.</u>  Borrower has good and marketable title to the assets reflected on the most recent balance sheet submitted to Lender, free and clear from all liens and encumbrances of any kind, except for (collectively, the "Permitted Liens") (a) current taxes and assessments not yet due and payable, (b) liens and encumbrances, if any, reflected or noted on such balance sheet or notes thereto, (c) assets disposed of in the ordinary course of business, and (d) any security interests, pledges, assignments or mortgages granted to Lender to secure the repayment or performance of the Obligations.

(h)    <u>Subsidiaries and Partnerships.</u>  Borrower has no subsidiaries and is not a party to any partnership agreement or joint venture agreement.

5.    <u>AFFIRMATIVE COVENANTS.</u>  Borrower covenants with, and represents and warrants to, Lender that, from and after the execution date of the Loan Documents until the Obligations are paid and satisfied in full:

(a)    <u>Access to Business Information.</u>  Borrower shall maintain proper books of accounts and records and enter therein complete and accurate entries and records of all of its transactions in accordance with generally accepted accounting principles and give representatives of Lender access thereto at all reasonable times, including permission to: (a) examine, copy and make abstracts from any such books and records and such other information which might be helpful to Lender in evaluating the status of the Obligations as it may reasonably

request from time to time, and (b) communicate directly with any of Borrower's officers, employees, agents, accountants or other financial advisors with respect to the business, financial conditions and other affairs of the Borrower.

(b) **Inspection of Collateral.** Borrower shall give Lender reasonable access to the Collateral and the other property securing the Obligations for the purpose of performing examinations thereof and to verify its condition or existence.

(c) **Financial Statements.** Borrower shall maintain a standard and modern system for accounting and shall furnish to Lender:

(i) Within 30 days after the end of each quarter, a copy of Borrower's financial statements for that quarter and for the year to date compiled by a firm of independent certified public accountants acceptable to Lender, (which acceptance shall not be unreasonably withheld) and certified as complete and correct, subject to changes resulting from year-end adjustments, by the principal financial officer of Borrower;

(ii) Within 120 days after the end of each fiscal year, a copy of Borrower's compiled financial statements by a firm of independent certified public accountants acceptable to Lender (which acceptance shall not be unreasonably withheld) and certified as complete and correct, subject to changes resulting from year-end adjustments, by the principal financial officer of Borrower;

(iii) With the statements submitted above, a certificate signed by the principal financial officer of Borrower, (i) stating he is familiar with all documents relating to Lender and that no Event of Default specified herein, nor any event which upon notice or lapse of time, or both would constitute such an Event of Default, has occurred, or if any such condition or event existed or exists, specifying it and describing what action Borrower has taken or proposes to take with respect thereto, and (ii) setting forth, in summary form, figures showing the financial status of Borrower in respect of the financial restrictions contained herein;

(iv) Within 30 days after the end of each quarter, Borrower shall deliver to Lender an accounts payable aging report in form and substance reasonably acceptable to Lender;

(v) Within 30 days after the end of each quarter, Borrower shall deliver to Lender an jobs completed report in form and substance reasonably acceptable to Lender;

(vi) Immediately upon any officer of Borrower obtaining knowledge of any condition or event which constitutes or, after notice or lapse of time or both, would constitute an Event of Default, a certificate of such person specifying the nature and period of the existence thereof, and what action Borrower has taken or is taking or proposes to take in respect thereof;

(vii) Within 30 days after the end of each quarter, Borrower shall deliver to Lender an accounts receivable aging report in form and substance reasonably acceptable to Lender;

(viii) Within 30 days after the end of each quarter, Borrower shall deliver to Lender a detailed summary of Borrower's jobs-in-progress in a form and substance reasonably acceptable to Lender. This report shall also include an indication of the status of each job.

All of the statements referred to in (i), (ii) and (v) above shall be in conformance with generally accepted accounting principles and give representatives of Lender access thereto at all reasonable times, including permission to examine, copy and make abstracts from any such books and records and such other information which might be helpful to Lender in evaluating the status of the loans as it may reasonably request from time to time.

20081218-16727

With all financial statements delivered to Lender as provided in (i), (ii) and (v) above, Borrower shall deliver to Lender a Financial Statement Compliance Certificate in addition to the other information set forth therein, which certifies the Borrower's compliance with the financial covenants set forth herein and that no Event of Default has occurred.

If at any time Borrower has any additional subsidiaries which have financial statements that could be consolidated with those of Borrower under generally accepted accounting principles, the financial statements required by subsections (i), (ii) and (v) above shall be the financial statements of Borrower and all such subsidiaries prepared on a consolidated and consolidating basis.

(d)    Condition and Repair.  Borrower shall maintain its equipment and all Collateral used in the operation of its business in good repair and working order and shall make all appropriate repairs, improvements and replacements thereof so that the business carried on in connection therewith may be properly and advantageously conducted at all times.

(e)    Insurance.  At its own cost, Borrower shall obtain and maintain insurance against (a) loss, destruction or damage to its properties and business of the kinds and in the amounts customarily insured against by corporations with established reputations engaged in the same or similar business as Borrower and, in any event, sufficient to fully protect Lender's interest in the Collateral, and (b) insurance against public liability and third party property damage of the kinds and in the amounts customarily insured against by corporations with established reputations engaged in the same or similar business as Borrower. All such policies shall (i) be issued by financially sound and reputable insurers, (ii) name Lender as an additional insured and, where applicable, as loss payee under a Lender loss payable endorsement satisfactory to Lender, and (iii) shall provide for thirty (30) days written notice to Lender before such policy is altered or canceled. All of the insurance policies required hereby shall be evidenced by one or more Certificates of Insurance delivered to Lender by Borrower on the Closing Date and at such other times as Lender may request from time to time.

(f)    Taxes.  Borrower shall pay when due all taxes, assessments and other governmental charges imposed upon it or its assets, franchises, business, income or profits before any penalty or interest accrues thereon (provided, however, that extensions for filing and payment of such taxes shall be permitted hereunder if disclosed to and consented to by Lender), and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums which by law might be a lien or charge upon any of its assets, provided that (unless any material item or property would be lost, forfeited or materially damaged as a result thereof) no such charge or claim need be paid if it is being diligently contested in good faith, if Lender is notified in advance of such contest and if Borrower establishes an adequate reserve or other appropriate provision required by generally accepted accounting principles and deposits with Lender cash or bond in an amount acceptable to Lender.

(g)    Existence; Business.  Borrower shall (a) maintain its existence as a corporation, (b) continue to engage primarily in business of the same general character as that now conducted, and (c) refrain from entering into any lines of business substantially different from the business or activities in which Borrower is presently engaged.

(h)    Compliance with Laws.  Borrower shall comply with all federal, state and local laws, regulations and orders applicable to Borrower or its assets including but not limited to all Environmental Laws, in all respects material to Borrower's business, assets or prospects and shall immediately notify Lender of any violation of any rule, regulation, statute, ordinance, order or law relating to the public health or the environment and of any complaint or notifications received by Borrower regarding to any environmental or safety and health rule, regulation, statute, ordinance or law. Borrower shall obtain and maintain any and all licenses, permits, franchises, governmental authorizations, patents, trademarks, copyrights or other rights necessary for the ownership of its properties and the advantageous conduct of its business and as may be required from time to time by applicable law.

(i)    Notice of Default.  Borrower shall, within ten (10) days of its knowledge thereof, give written notice to Lender of: (a) the occurrence of any event or the existence of any condition which would be, after notice or lapse of applicable grace-periods, an Event of Default, and (b) the occurrence of any event or the existence of

any condition which would prohibit or limit the ability of Borrower to reaffirm any of the representations or warranties, or to perform any of the covenants, set forth herein.

(j)    Costs.    Borrower shall reimburse Lender for any and all fees, costs and expenses including, without limitation, reasonable attorneys' fees, other professionals' fees, appraisal fees, environmental assessment fees (including Phase I and Phase II assessments), field exam audits, expert fees, court costs, litigation and other expenses (collectively, the "Costs") incurred or paid by Lender or any of its officers, employees or agents in connection with: (a) the preparation, negotiation, procurement, review, administration or enforcement of the Loan Documents or any instrument, agreement, document, policy, consent, waiver, subordination, release of lien, termination statement, satisfaction of mortgage, financing statement or other lien search, recording or filing related thereto (or any amendment, modification or extension to, or any replacement or substitution for, any of the foregoing), whether or not any particular portion of the transactions contemplated during such negotiations is ultimately consummated, and (b) the defense, preservation and protection of Lender's rights and remedies thereunder, including without limitation, its security interest in the Collateral or any other property pledged to secure the Loans, whether incurred in, bankruptcy, insolvency, foreclosure or other litigation or proceedings or otherwise. The Costs shall be due and payable upon demand by Lender. If Borrower fails to pay the Costs when upon such demand, Lender is entitled to disburse such sums as Obligations. Thereafter, the Costs shall bear interest from the date incurred or disbursed at the highest rate set forth in the Note(s). This provision shall survive the termination of this Agreement and/or the repayment of any amounts due or the performance of any Obligation.

(k)    Other Amounts Deemed Loans.    If Borrower fails to pay any tax, assessment, governmental charge or levy or to maintain insurance within the time permitted or required by this Note, or to discharge any Lien prohibited hereby, or to comply with any other Obligation, Lender may, but shall not be obligated to, pay, satisfy, discharge or bond the same for the account of Borrower. To the extent permitted by law and at the option of Lender, all monies so paid by Lender on behalf of Borrower shall be deemed Obligations and Borrower's payments under this Note may be increased to provide for payment of such Obligations plus interest thereon.

(l)    Further Assurances.    Borrower shall execute, acknowledge and deliver, or cause to be executed, acknowledged or delivered, any and all such further assurances and other agreements or instruments, and take or cause to be taken all such other action, as shall be reasonably necessary from time to time to give full effect to the Loan Documents and the transactions contemplated thereby.

6.    NEGATIVE COVENANTS.    Borrower covenants with, and represents and warrants to, Lender that, from and after the execution date hereof until the Obligations are paid and satisfied in full:

(a)    Merger; Disposition of Assets.    Borrower shall not (a) change its capital structure, (b) merge or consolidate with any entity, (c) amend or change its articles of incorporation and code of regulations or by-laws or (d) sell, lease, transfer or otherwise dispose of, or grant any person an option to acquire, or sell and leaseback, all or any substantial portion of its assets, whether now owned or hereafter acquired, except for bona fide sales of inventory in the ordinary course of business and dispositions of property which is obsolete and not used or useful in its business.

7.    FINANCIAL COVENANTS.    Borrower and Lender hereby agrees as follows:

(a)    Debt Service Coverage Ratio.    Borrower shall not permit its Debt Service Coverage Ratio, on a consolidated basis, to be less than the following at the end of any year during any of the following periods:

| Period | Min. Ratio |
|---|---|
| 01/01/2007 and thereafter | 1.25 to 1.0 |

(b)    Minimum Tangible Capital Base.    At the end of each fiscal year of Borrower during the following time periods, Borrower shall maintain a minimum Tangible Capital Base on a consolidated basis of at least the following amounts:

| Period | Min. Amount |
|---|---|
| 01/01/2007 and thereafter | $150,000.00 |

8.  DEFINITIONS.  Certain capitalized terms have the meanings set forth on any exhibit hereto, in the Security Agreement, if applicable, or any other Loan Document.  All financial terms used herein but not defined on the exhibits, in the Security Agreement, if applicable, or any other Loan Document have the meanings given to them by generally accepted accounting principles.  All other undefined terms have the meanings given to them in the Uniform Commercial Code as adopted in the state whose law governs this instrument.  The following definitions are used herein:

(a)    "Debt Service Coverage Ratio" means the ratio of (a) the sum of Borrower's net income for a fiscal year before taxes, depreciation, amortization, rents, and interest expense, less distributions, dividends and other extraordinary items to (b) the sum of (i) Borrower's interest expense and rents and (ii) all principal payments with respect to Indebtedness that were paid or were due and payable by all consolidated entities during the period.

(b)    "Indebtedness" means (i) all items (except items of capital stock, of capital surplus, of general contingency reserves or of retained earnings, deferred income taxes, and amount attributable to minority interest if any) which in accordance with generally accepted accounting principles would be included in determining total liabilities on a consolidated basis (if Borrower should have a subsidiary) as shown on the liability side of a balance sheet as at the date as of which Indebtedness is to be determined, (ii) all indebtedness secured by any mortgage, pledge, lien or conditional sale or other title retention agreement to which any property or asset owned or held is subject, whether or not the indebtedness secured thereby shall have been assumed (excluding non-capitalized leases which may amount to title retention agreements but including capitalized leases), and (iii) all indebtedness of others which Borrower or any subsidiary has directly or indirectly guaranteed, endorse (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which Borrower or any subsidiary has agreed to apply or advance funds (whether by way of loan, stock purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

(c)    "Lien" means any security interest, mortgage, pledge, assignment, lien or other encumbrance of any kind, including interests of vendors or lessors under conditional sale contracts or capital leases.

(d)    "Loan Documents" means any and all Rate Management Agreements and each and every document or agreement executed by any party evidencing, guarantying or securing any of the Obligations; and "Loan Document" means any one of the Loan Documents.

(e)    "Long Term Debt" means indebtedness which either by its terms is not payable in full within one year from the date incurred, or the repayment of which may, at the option of the obligor, be extended for a period of more than one year from the date incurred.

(f)    "Obligation(s)" means all loans, advances, indebtedness and each and every other obligation or liability of Borrower owed to each of Lender and/or any affiliate of Fifth Third Bancorp, however created, of every kind and description whether now existing or hereafter arising and whether direct or indirect, primary or as guarantor or surety, absolute or contingent, liquidated or unliquidated, matured or unmatured, participated in whole or in part, created by trust agreement, lease overdraft, agreement or otherwise, whether or not secured by additional collateral, whether originated with Lender or owed to others and acquired by Lender by purchase, assignment or otherwise, and including, without limitation, all loans, advances, indebtedness and each and every obligation or liability arising under the loan document, any and all Rate Management Obligations (as defined in the Loan Documents), letters of credit now or hereafter issued by Lender or any affiliate of Fifth Third Bancorp for the benefit of or at the request of Borrower, all obligations to perform or forbear from performing acts, and agreements, instruments and documents evidencing, guarantying, securing or otherwise executed in connection with any of the foregoing, together with any amendments, modifications and restatements thereof, and all expenses and attorneys' fees incurred by Lender hereunder or any other document, instrument or agreement related to any of the foregoing.

(g)     "Subordinated Indebtedness" means Indebtedness that is subordinated to the Obligations owed to Lender, in a manner satisfactory to Lender in form and substance.

(h)     "Subsidiary" means any corporation of which Borrower directly or indirectly owns or controls at the time outstanding stock having ordinary circumstances (not depending on the happening of a contingency) voting power to elect a majority of the board of directors of said corporation.

(i)     "Tangible Capital Base" means the sum of the Tangible Net Worth of Borrower, and all Subordinated Indebtedness.

(j)     "Tangible Net Worth" shall mean the total of the capital stock (less treasury stock), paid-in capital surplus, general contingency reserves and retained earnings (deficit) of Borrower and any Subsidiary as determined on a consolidated basis in accordance with generally accepted accounting principles after eliminating all inter-company items and all amounts properly attributable to minority interests, if any, in the stock and surplus of any Subsidiary, minus the following items (without duplication of deductions), if any, appearing on the consolidated balance sheet of Borrower:

        (i)     all deferred charges (less amortization, unamortized debt discount and expense and corporate organization expenses);

        (ii)     the book amount of all assets which would be treated as intangibles under generally accepted accounting principles, including, without limitation, such items as goodwill, trademark applications, trade names, service marks, brand names, copyrights, patents, patent applications and licenses, and rights with respect to the foregoing;

        (iii)     the amount by which aggregate inventories or aggregate securities appearing on the asset side of such consolidated balance sheet exceed the lower of cost or market value (at the date of such balance sheet) thereof;

        (iv)     any write-up in the book amount of any asset resulting from a revaluation thereof from the book amount entered upon acquisition of such asset; and

        (v)     Any related party notes or accounts receivable. Related parties shall generally include entities with common ownership or management with the Borrower, and employees of the Borrower.

(k)     "Rate Management Agreement" means any agreement, device or arrangement providing for payments which are related to fluctuations of interest rates, exchange rates, forward rates, or equity prices, including, but not limited to, dollar-denominated or cross-currency interest rate exchange agreements, forward currency exchange agreements, interest rate cap or collar protection agreements, forward rate currency or interest rate options, puts and warrants, and any agreement pertaining to equity derivative transactions (e.g., equity or equity index swaps, options, caps, floors, collars and forwards), including without limitation any ISDA Master Agreement between Borrower and Lender or any affiliate of Fifth Third Bancorp, and any schedules, confirmations and documents and other confirming evidence between the parties confirming transactions thereunder, all whether now existing or hereafter arising, and in each case as amended, modified or supplemented from time to time.

(l)     "Rate Management Obligations" means any and all obligations of Borrower to Lender or any affiliate of Fifth Third Bancorp, whether absolute, contingent or otherwise and howsoever and whensoever (whether now or hereafter) created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefore), under or in connection with (i) any and all Rate Management Agreements, and (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any Rate Management Agreement.

9.     EVENTS OF DEFAULT. Upon the occurrence of any of the following events (each, an "Event of Default"), Lender may, at its option, without any demand or notice whatsoever, cease making advances and declare this

Note and all Obligations to be fully due and payable in their aggregate amount, together with accrued interest and all prepayment premiums, fees, and charges applicable thereto:

(a)     Any failure to make any payment when due of principal or accrued interest on this Note or any other Obligation and such nonpayment remains uncured for 10 days after written notice from Lender to Borrower of such default.

(b)     Any representation or warranty of Borrower set forth in this Note or in any agreement, instrument, document, certificate or financial statement evidencing, guarantying, securing or otherwise related to, this Note or any other Obligation shall be materially inaccurate or misleading.

(c)     Borrower shall fail to observe or perform any other material term or condition of this Note or any other term or condition set forth in any agreement, instrument, document, certificate or financial statement evidencing, guarantying or otherwise related to this Note or any other Obligation, or Borrower shall otherwise default in the observance or performance of any covenant or agreement set forth in any of the foregoing for 30 days after written notice from Lender to Borrower of such default.

(d)     The dissolution of Borrower or of any endorser or guarantor of the Obligations, or the merger or consolidation of any of the foregoing with a third party, or the lease, sale or other conveyance of a material part of the assets or business of any of the foregoing to a third party outside the ordinary course of its business, or the lease, purchase or other acquisition of a material part of the assets or business of a third party by any of the foregoing.

(e)     The creation of any Lien (except a lien to Lender) on, the institution of any garnishment proceedings by attachment, levy or otherwise against, the entry of a judgment against, or the seizure of, any of the property of Borrower or any endorser or guarantor hereof including, without limitation, any property deposited with Lender.

(f)     In the reasonable judgment of Lender in good faith, any material adverse change occurs in the existing or prospective financial condition of Borrower that will affect the ability of Borrower to repay the Obligations.

(g)     A commencement by the Borrower of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or the entry of a decree or order for relief in respect of the Borrower in a case under any such law or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Borrower, or for any substantial part of the property of Borrower, or ordering the wind-up or liquidation of the affairs of Borrower; or the filing and pendency for 30 days without dismissal of a petition initiating an involuntary case under any such bankruptcy, insolvency or similar law; or the making by Borrower of any general assignment for the benefit of creditors; or the failure of the Borrower of the Obligations generally to pay its debts as such debts become due; or the taking of action by the Borrower in furtherance of any of the foregoing.

(h)     Nonpayment by the Borrower of any Rate Management Obligation relating to this Note when due or the breach by the Borrower of any term, provision or condition contained in any Rate Management Agreement.

10.     REMEDIES.   After the occurrence of an Event of Default, in addition to any other remedy permitted by law, Lender may at any time, without notice, apply the Collateral to this Note or such other Obligations, whether due or not, and Lender may, at its option, proceed to enforce and protect its rights by an action at law or in equity or by any other appropriate proceedings; provided that this Note and the Obligations shall be accelerated automatically and immediately if the Event of Default is a filing under the Bankruptcy Code.

Lender's rights and remedies hereunder are cumulative, and may be exercised together, separately, and in any order. No delay on the part of Lender in the exercise of any such right or remedy shall operate as a waiver. No single or partial exercise by Lender of any right or remedy shall preclude any other further exercise of it or the exercise of any other right or

remedy. No waiver or indulgence by Lender of any Event of Default shall be effective unless in writing and signed by Lender, nor shall a waiver on one occasion be construed as a waiver of any other occurrence in the future.

11.   LATE PAYMENTS; DEFAULT RATE; FEES.  If any payment is not paid when due (whether by acceleration or otherwise) or within 10 days thereafter, undersigned agrees to pay to Lender a late payment fee as provided for in any loan agreement or 5% of the payment amount, whichever is greater with a minimum fee of $20.00. After an Event of Default, Borrower agrees to pay to Lender a fixed charge of $25.00, or Borrower agrees that Lender may, without notice, increase the Interest Rate by three percentage points (3%) (the "Default Rate"), whichever is greater. Lender may impose a non-sufficient funds fee for any check that is presented for payment that is returned for any reason. In addition, Lender may charge loan documentation fees as may be reasonably determined by the Lender.

12.   ENTIRE AGREEMENT.  Borrower agrees that there are no conditions or understandings which are not expressed in this Note and the documents referred to herein.

13.   SEVERABILITY.  The declaration of invalidity of any provision of this Note shall not affect any part of the remainder of the provisions.

14.   ASSIGNMENT.  Borrower agrees not to assign any of Borrower's rights, remedies or obligations described in this Note without the prior written consent of Lender. Borrower agrees that Lender may assign some or all of its rights and remedies described in this Note without notice to, or prior consent from, the Borrower.

15.   MODIFICATION; WAIVER OF LENDER.  The modification or waiver of any of Borrower's obligations or Lender's rights under this Note must be contained in a writing signed by Lender.  Lender may perform Borrower's obligations, or delay or fail to exercise any of its rights or remedies, without causing a waiver of those obligations or rights. A waiver on one occasion shall not constitute a waiver on another occasion. Borrower's obligations under this Note shall not be affected if Lender amends, compromises, exchanges, fails to exercise, impairs or releases (i) any of the obligations belonging to any co- borrower, endorser or guarantor or (ii) any of its rights against any co- borrower, guarantor or endorser.

16.   WAIVER OF BORROWER.  Demand, presentment, protest and notice of dishonor, notice of protest and notice of default are hereby waived by Borrower, and any endorser or guarantor hereof. Each of Borrower, including but not limited to all co-makers and accommodation makers of this Note, hereby waives all suretyship defenses including but not limited to all defenses based upon impairment of Collateral and all suretyship defenses described in Section 3-605 of the Uniform Commercial Code (the "UCC").  Such waiver is entered to the full extent permitted by Section 3-605 (i), of the UCC.

17.   GOVERNING LAW; CONSENT TO JURISDICTION.  This Note is delivered in, is intended to be performed in, will be construed and enforceable in accordance with and governed by the internal laws of, the State of Illinois, without regard to principles of conflicts of law.  Borrower agrees that the state and federal courts in the County where the Lender is located shall have exclusive jurisdiction over all matters arising out of this Note, and that service of process in any such proceeding shall be effective if mailed to Borrower at the address set forth herein.

18.   JURY WAIVER.  BORROWER, AND ANY ENDORSER OR GUARANTOR HEREOF, WAIVE THE RIGHT TO A TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

19.   WARRANT OF ATTORNEY.  Borrower authorizes any attorney of record to appear for it in any court of record in the State of Illinois, after maturity of this Note, whether by its terms or upon default, acceleration or otherwise, to waive the issuance and service of process, and release all errors, and to confess judgment against it in favor of Lender for the principal sum due herein together with interest, charges, court costs and attorneys' fees. Stay of execution and all exemptions are hereby waived. If this Note or any Obligation is referred to an attorney for collection, and the payment is obtained without the entry of a judgment, the obligors shall pay to the holder of such obligations its attorneys' fees. EACH OF BORROWER AND ANY ENDORSER OR ANY GUARANTOR AGREES THAT AN ATTORNEY WHO IS COUNSEL TO LENDER OR ANY OTHER HOLDER OF SUCH OBLIGATION MAY ALSO ACT AS ATTORNEY OF RECORD FOR BORROWER WHEN TAKING THE ACTIONS DESCRIBED ABOVE IN THIS PARAGRAPH.  BORROWER AGREES

20081218-16727

THAT ANY ATTORNEY TAKING SUCH ACTIONS MAY BE PAID FOR THOSE SERVICES BY LENDER OR HOLDER OF SUCH OBLIGATION. BORROWER WAIVES ANY CONFLICT OF INTEREST THAT MAY BE CREATED BECAUSE THE ATTORNEY REPRESENTING THE BORROWER IS BEING PAID BY LENDER OR THE HOLDER OF SUCH OBLIGATION.

BORROWER:

MCK Services, Inc., an Illinois corporation

By: _____
(Authorized Signer)

Christine F. Kraft, President
(Print Name and Title)

JENN

**Fifth Third Bank**

Request for Credit Commitment Change in Terms/Short Term Extension

Credit Recommended by:
Recommended by:        CHAD E. COSTELL
Reviewed by:

Red 3.3.09

As of Date:   01/16/2009
Customer:    MCK SERVICES INC.
OREI #:      5909650928
OWNER:       H3

Uses
Added 3.2

CHANGE IN TERMS (Non-Material) / SHORT TERM EXTENSION (45 Day One Time Max)
Hereby, Fifth Third to allow completion of year end financials and to show how work out amortization restructure will inclube principal reduction.

| Borrower | Loan # | Type | Commitment | Principal Current Balance | Outstanding | Security | Rate | Maturity Date |
|---|---|---|---|---|---|---|---|---|
| MCK SERVICES INC. | 28 | 248 | $1.00 | $793,150.11 | $793,150.11 | First Lien on Personal Residence | 4.75% | 12/03/2008 |

Approved By: _____    Date: 1-05-09

1

023 - FTCH                    FIFTH THIRD BANK

## Amendment to Revolving Note

NOTE No. 0905659926-00018

    This Amendment to Revolving Note is dated as of October 3, 2008 and amends that certain Revolving Note dated as of July 3, 2007 made by MCK Services, Inc., an Illinois corporation located at 575 North Henderson Road, Freeport, Stephenson County, Illinois 61032, as borrower ("Borrower") payable to the order of Fifth Third Bank, a Michigan banking corporation located at 222 South Riverside Plaza, Chicago, Cook County, Illinois 60606 for itself and as agent for any affiliate of Fifth Third Bancorp, as payee ("Lender") in the original principal amount of Eight Hundred Thousand and 00/100 Dollars ($800,000.00) (together with all previous amendments or modifications thereto, the "Note").

    WHEREAS, Borrower and Lender have agreed to amend the Note on the terms and subject to the conditions set forth herein.

    NOW, THEREFORE, intending to be legally bound, Borrower and Lender hereby agree as follows:

    1.    The Maturity Date of the Note is hereby extended until December 3, 2008 (the "Maturity Date").

    2.    Borrower agrees to pay on the date of this Amendment a note processing fee in the amount of $500.00 plus all of Lender's reasonable out of pockets costs and expenses including counsel fees.

    3.    This Amendment is a continuation of the Note and shall not be construed as a novation or extinguishment of the obligations arising under the Note as originally issued, and the issuance of this Amendment shall not effect the priority of any security interest granted in connection with the Note. The execution of this Amendment shall not be deemed to be a waiver of any default or Event of Default.

    4.    This Amendment shall be effective when the Borrower shall have delivered to the Lender, in form and substance satisfactory to the Lender, the following items: (a) this Amendment fully signed by Borrower and Lender; (b) resolutions of the Borrower authorizing the execution and delivery of this Amendment; and (c) such additional information and materials as Lender may reasonably request.

    5.    Except as modified hereby, the Note remains unaltered and in full force and effect. This Amendment shall be considered an integral part of the Note, and all references to the Note in the Note itself or any other Loan Documents shall, on and after the date of this Amendment, be deemed to be references to the Note as amended by this Amendment

    6.    Borrower hereby acknowledges that there has been a 90-day extension of the Note granted by Lender since the previous Maturity Date of the Note, and Borrower ratifies such 90-day extension granted by Lender in all respects.

    7.    WARRANT OF ATTORNEY. Borrower authorizes any attorney of record to appear for it in any court of record in the State of Illinois, after maturity of this Note, whether by its terms or upon default, acceleration or otherwise, to waive the issuance and service of process, and release all errors, and to confess judgment against it in favor of Lender for the principal sum due herein together with interest, charges, court costs and attorneys' fees. Stay of execution and all exemptions are hereby waived. If this Note or any Obligation is referred to an attorney for collection, and the payment is obtained without the entry of a judgment, the obligors shall pay to the holder of such obligations its attorneys' fees. EACH OF BORROWER AND ANY ENDORSER OR ANY GUARANTOR AGREES THAT AN ATTORNEY WHO IS COUNSEL TO LENDER OR ANY OTHER HOLDER OF SUCH OBLIGATION MAY ALSO ACT AS ATTORNEY OF RECORD FOR BORROWER WHEN TAKING THE ACTIONS DESCRIBED ABOVE IN THIS PARAGRAPH. BORROWER AGREES THAT ANY ATTORNEY TAKING SUCH ACTIONS MAY BE PAID FOR THOSE SERVICES BY LENDER OR HOLDER OF SUCH OBLIGATION. BORROWER WAIVES ANY CONFLICT OF INTEREST THAT MAY BE CREATED BECAUSE THE ATTORNEY REPRESENTING THE BORROWER IS BEING PAID BY LENDER OR THE HOLDER OF SUCH OBLIGATION.

63436-31-1-1

IN WITNESS WHEREOF, the Borrower has executed this Amendment as of the date written above.

ACCEPTED AND AGREED:                              BORROWER:

Fifth Third Bank, a Michigan banking corporation     MCK Services, Inc., an Illinois corporation

By: _____                    By: _____
(Signature)                                       (Authorized Signer)

_____
Rusty DuToe - V.P.                                Christine F. Kraft, President
(Print Name and Title)                            (Print Name and Title)

023.- FITCH

**🐙 Fifth Third Bank**

Term Note

9056599920/34

OFFICER No. 09358                                    NOTE No. _____-_____
$40,000.00                                                    July 3, 2007
                                                            (Effective Date)

1.    **PROMISE TO PAY.** On or before July 3, 2012 (the "Maturity Date"), the undersigned, MCK Services, Inc., an Illinois corporation located at 575 North Henderson Road, Freeport, Stephenson County, Illinois 61032 ("Borrower") for value received, hereby promises to pay to the order of Fifth Third Bank, a Michigan banking corporation located at 222 South Riverside Plaza, Chicago, Cook County, Illinois 60606 for itself and as agent for any affiliate of Fifth Third Bancorp (together with its successors and assigns, the "Lender") the sum of Forty Thousand and 00/100 Dollars ($40,000.00) (the "Borrowing"), plus interest as provided herein, less such amounts as shall have been repaid in accordance with this Note. The outstanding balance of this Note shall appear on a supplemental bank record and is not necessarily the face amount of this Note, which record shall evidence the balance due pursuant to this Note at any time.

Principal and interest payments shall be initiated by Lender in accordance with the terms of this Note from Borrower's account through BillPayer 2000®. Borrower hereby authorizes Lender to initiate such payments from Borrower's account located at Fifth Third Bank, routing number 071923909 account number 7232238548. Borrower acknowledges and agrees that use of BillPayer 2000® shall be governed by the BillPayer 2000® Terms and Conditions, a copy of which Borrower acknowledges receipt. Borrower further acknowledges and agrees to maintain payments hereunder through BillPayer 2000® throughout the term of this Note. Each payment hereunder shall be applied first to advanced costs, charges and fees, then to accrued interest, and then to principal.

The outstanding balance of this Note shall be due and payable in 59 installments of principal and interest, each in the amount of $816.00 on the 3rd day of each calendar month beginning on August 3, 2007; provided that the entire principal balance, together with all accrued and unpaid interest and any other charges, advances and fees, if any, outstanding hereunder shall be due and payable in full on the earlier of the Maturity Date or upon acceleration of the Note.

The principal sum outstanding shall bear interest at a fixed rate per annum equal to 8.25% (the "Interest Rate"). Interest shall be calculated based on a 360-day year and charged for the actual number of days elapsed, and shall be payable on the 3rd day of each month beginning on August 3, 2007.

Notwithstanding any provision to the contrary in this Note, in no event shall the interest rate charged on the Borrowing exceed the maximum rate of interest permitted under applicable state and/or federal usury law. Any payment of interest that would be deemed unlawful under applicable law for any reason shall be deemed received on account of, and will automatically be applied to reduce, the principal sum outstanding and any other sums (other than interest) due and payable to Lender under this Note, and the provisions hereof shall be deemed amended to provide for the highest rate of interest permitted under applicable law.

2.    **USE OF PROCEEDS.** Borrower certifies that the proceeds of this loan are to be used for business purposes.

3.    **NOTE PROCESSING FEE.** Lender may charge, and Borrower agrees to pay on the above Effective Date, a note processing fee in the amount of $500.00.

4.    **REPRESENTATIONS AND WARRANTIES.** Borrower hereby warrants and represents to Lender the following:

(a)    *Organization and Qualification.* Borrower is duly organized, validly existing and in good standing under the laws of the State of its incorporation, has the power and authority to carry on its business and to enter into and perform all documents relating to this loan transaction, and is qualified and licensed to do business in each jurisdiction in which such qualification or licensing is required. All information provided to Lender with respect to Borrower and its operations is true and correct.

EXHIBIT
**B**

(b)    Due Authorization.    The execution, delivery and performance by Borrower of the Loan Documents have been duly authorized by all necessary corporate action, and shall not contravene any law or any governmental rule or order binding on Borrower, or the articles of incorporation and code of regulations or by-laws of Borrower, nor violate any agreement or instrument by which Borrower is bound nor result in the creation of a Lien on any assets of Borrower except the Lien granted to Lender herein. Borrower has duly executed and delivered to Lender the Loan Documents and they are valid and binding obligations of Borrower enforceable according to their respective terms, except as limited by equitable principles and by bankruptcy, insolvency or similar laws affecting the rights of creditors generally. No notice to, or consent by, any governmental body is needed in connection with this transaction.

(c)    Litigation.    There are no suits or proceedings pending or threatened against or affecting Borrower, and no proceedings before any governmental body are pending or threatened against Borrower except as otherwise specifically disclosed to Lender on or prior to the Effective Date or as set forth on any Litigation Exhibit which may be attached hereto.

(d)    Business.    Borrower is not a party to or subject to any agreement or restriction that may have a material adverse effect on Borrower's business, properties or prospects. Borrower has all franchises, authorizations, patents, trademarks, copyrights and other rights necessary to advantageously conduct its business. They are all in full force and effect and are not in known conflict with the rights of others.

(e)    Licenses, etc.    Borrower has obtained any and all licenses, permits, franchises, governmental authorizations, patents, trademarks, copyrights or other rights necessary for the ownership of its properties and the advantageous conduct of its business. Borrower possesses adequate licenses, patents, patent applications, copyrights, trademarks, trademark applications, and trade names to continue to conduct its business as heretofore conducted by it, without any conflict with the rights of any other person or entity. All of the foregoing are in full force and effect and none of the foregoing are in known conflict with the rights of others.

(f)    Laws.    Borrower is in material compliance with all laws, regulations, rulings, orders, injunctions, decrees, conditions or other requirements applicable to or imposed upon Borrower by any law or by any governmental authority, court or agency.

(g)    Title.    Borrower has good and marketable title to the assets reflected on the most recent balance sheet submitted to Lender, free and clear from all liens and encumbrances of any kind, except for (collectively, the "Permitted Liens") (a) current taxes and assessments not yet due and payable, (b) liens and encumbrances, if any, reflected or noted on such balance sheet or notes thereto, (c) assets disposed of in the ordinary course of business, and (d) any security interests, pledges, assignments or mortgages granted to Lender to secure the repayment or performance of the Obligations.

(h)    Subsidiaries and Partnerships.    Borrower has no subsidiaries and is not a party to any partnership agreement or joint venture agreement.

5.    AFFIRMATIVE COVENANTS.    Borrower covenants with, and represents and warrants to, Lender that, from and after the execution date of the Loan Documents until the Obligations are paid and satisfied in full:

(a)    Access to Business Information.    Borrower shall maintain proper books of accounts and records and enter therein complete and accurate entries and records of all of its transactions in accordance with generally accepted accounting principles and give representatives of Lender access thereto at all reasonable times, including permission to: (a) examine, copy and make abstracts from any such books and records and such other information which might be helpful to Lender in evaluating the status of the Obligations as it may reasonably request from time to time, and (b) communicate directly with any of Borrower's officers, employees, agents, accountants or other financial advisors with respect to the business, financial conditions and other affairs of the Borrower.

(b)    Inspection of Collateral.    Borrower shall give Lender reasonable access to the Collateral and the other property securing the Obligations for the purpose of performing examinations thereof and to verify its condition or existence.

(c)   Financial Statements.   Borrower shall maintain a standard and modern system for accounting and shall furnish to Lender:

(i)   Within 30 days after the end of each quarter, a copy of Borrower's financial statements for that quarter and for the year to date compiled by a firm of independent certified public accountants acceptable to Lender, (which acceptance shall not be unreasonably withheld) and certified as complete and correct, subject to changes resulting from year-end adjustments, by the principal financial officer of Borrower;

(ii)   Within 120 days after the end of each fiscal year, a copy of Borrower's compiled financial statements by a firm of independent certified public accountants acceptable to Lender (which acceptance shall not be unreasonably withheld) and certified as complete and correct, subject to changes resulting from year-end adjustments, by the principal financial officer of Borrower;

(iii)   With the statements submitted above, a certificate signed by the principal financial officer of Borrower, (i) stating he is familiar with all documents relating to Lender and that no Event of Default specified herein, nor any event which, upon notice or lapse of time, or both would constitute such an Event of Default, has occurred, or if any, such condition or event, existed or exists, specifying it and describing what action Borrower has taken or proposes to take with respect thereto, and (ii) setting forth, in summary form, figures showing the financial status of Borrower in respect of the financial restrictions contained herein;

(iv)   Within 30 days after the end of each quarter, Borrower shall deliver to Lender an accounts payable aging report in form and substance reasonably acceptable to Lender;

(v)   Within 30 days after the end of each quarter, Borrower shall deliver to Lender an jobs completed report in form and substance reasonably acceptable to Lender;

(vi)   Immediately upon any officer of Borrower obtaining knowledge of any condition or event which constitutes or, after notice or lapse of time or both, would constitute an Event of Default, a certificate of such person specifying the nature and period of the existence thereof, and what action Borrower has taken or is taking or proposes to take in respect thereof;

(vii)   Within 30 days after the end of each quarter, Borrower shall deliver to Lender an accounts receivable aging report in form and substance reasonably acceptable to Lender;

(viii)   Within 30 days after the end of each quarter, Borrower shall deliver to Lender a detailed summary of Borrower's jobs-in-progress in form and substance reasonably acceptable to Lender. This report shall also include an indication of the status of each job.

All of the statements referred to in (i), (ii) and (iii) above shall be in conformance with generally accepted accounting principles and give representatives Lender access thereto at all reasonable times, including permission to examine, copy and make abstracts from any such books and records and such other information which might be helpful to Lender in evaluating the status of the loans as it may reasonably request from time to time.

With all financial statements delivered to Lender as provided in (i), (ii) and (v) above, Borrower shall deliver to Lender a Financial Statement Compliance Certificate certifies the Borrower's compliance with the financial covenants set forth herein and that no Event of Default has occurred.

If at any time Borrower has any additional subsidiaries which have financial statements that could be consolidated with those of Borrower under generally accepted accounting principles, the financial statements required by subsections (i), (ii) and (v) above shall be the financial statements of Borrower and all such subsidiaries prepared on a consolidated and consolidating basis.

(d)    _Condition and Repair._  Borrower shall maintain its equipment and all Collateral used in the operation of its business in good repair and working order and shall make all appropriate repairs, improvements and replacements thereof so that the business carried on in connection therewith may be properly and advantageously conducted at all times.

(e)    _Insurance._  At its own cost, Borrower shall obtain and maintain insurance against (a) loss, destruction or damage to its properties and business of the kinds and in the amounts customarily insured against by corporations with established reputations engaged in the same or similar business as Borrower and, in any event, sufficient to fully protect Lender's interest in the Collateral, and (b) insurance against public liability and third party property damage of the kinds and in the amounts customarily insured against by corporations with established reputations engaged in the same or similar business as Borrower. All such policies shall (i) be issued by financially sound and reputable insurers, (ii) name Lender as an additional insured and, where applicable, as loss payee under a Lender loss payable endorsement satisfactory to Lender, and (iii) shall provide for thirty (30) days written notice to Lender before such policy is altered or canceled.  All of the insurance policies required hereby shall be evidenced by one or more Certificates of Insurance delivered to Lender by Borrower on the Closing Date and at such other times as Lender may request from time to time.

(f)    _Taxes._  Borrower shall pay when due all taxes, assessments and other governmental charges imposed upon it or its assets, franchises, business, income or profits before any penalty or interest accrues thereon (provided, however, that extensions for filing and payment of such taxes shall be permitted hereunder if disclosed to and consented to by Lender), and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums which by law might become a lien or charge upon any of its assets, provided that (unless any material item or property would be lost, forfeited or materially damaged as a result thereof) no such charge or claim need be paid if it is being diligently contested in good faith, if Lender is notified in advance of such contest and if Borrower establishes an adequate reserve or other appropriate provision required by generally accepted accounting principles and deposits with Lender cash or bond in an amount acceptable to Lender.

(g)    _Existence; Business._  Borrower shall (a) maintain its existence as a corporation, (b) continue to engage primarily in business of the same general character as that now conducted, and (c) refrain from entering into any lines of business substantially different from the business or activities in which Borrower is presently engaged.

(h)    _Compliance with Laws._  Borrower shall comply with all federal, state and local laws, regulations and orders applicable to Borrower or its assets including but not limited to all Environmental Laws, in all respects material to Borrower's business, assets or prospects and shall immediately notify Lender of any violation of any rule, regulation, statute, ordinance, order or law relating to the public health or the environment and of any complaint or notifications received by Borrower regarding to any environmental or safety and health rule, regulation, statute, ordinance or law.  Borrower shall obtain and maintain any and all licenses, permits, franchises, governmental authorizations, patents, trademarks, copyrights or other rights necessary for the ownership of its properties and the advantageous conduct of its business and as may be required from time to time by applicable law.

(i)    _Notice of Default._  Borrower shall, within ten (10) days of its knowledge thereof, give written notice to Lender of: (a) the occurrence of any event or lapse of applicable grace periods, an Event of Default, and (b) the occurrence of any event or the existence of any condition which would prohibit or limit the ability of Borrower to reaffirm any of the representations or warranties, or to perform any of the covenants, set forth herein.

(j)    _Costs._  Borrower shall reimburse Lender for any and all fees, costs and expenses including, without limitation, reasonable attorneys' fees, other professionals' fees, appraisal fees, environmental assessment fees (including Phase I and Phase II assessments), field exam audits, expert fees, court costs, litigation and other expenses (collectively, the "Costs") incurred or paid by Lender or any of its officers, employees or agents in connection with: (a) the preparation, negotiation, procurement, review, administration or enforcement of the Loan Documents or any instrument, agreement, document, policy, consent, waiver, subordination, release of lien,

termination statement, satisfaction of mortgage, fi. ncing statement or other lien search, recording or filing related thereto (or any amendment, modification or ext    ion to, or any replacement or substitution for, any of the foregoing), whether or not any particular portic    the transactions contemplated during such negotiations is ultimately consummated, and (b) the defense,    servation and protection of Lender's rights and remedies thereunder, including without limitation, its secu    nterest in the Collateral or any other property pledged to secure the Loans, whether incurred in bankrup' y, nsolvency, foreclosure or other litigation or proceedings or otherwise. The Costs shall be due and payable u c demand by Lender. If Borrower fails to pay the Costs when upon such demand, Lender is entitled to disbu    uch sums as Obligations. Thereafter, the Costs shall bear interest from the date incurred or disbursed at the ii est rate set forth in the Note(s). This provision shall survive the termination of this Agreement and/or the repr    t of any amounts due or the performance of any Obligation.

    (k)    Other Amounts Deemed Loar    Borrower fails to pay any tax, assessment, governmental charge or levy or to maintain insurance within th    permitted or required by this Note, or to discharge any Lien prohibited hereby, or to comply with any other C    ion, Lender may, but shall not be obligated to, pay, satisfy, discharge or bond the same for the account of    ower. To the extent permitted by law and at the option of Lender, all monies so paid by Lender on be    f Borrower shall be deemed Obligations and Borrower's payments under this Note may be increased to p    i for payment of such Obligations plus interest thereon.

    (l)    Further Assurances. Borrov    all execute, acknowledge and deliver, or cause to be executed, acknowledged or delivered, any and c    h further assurances and other agreements or instruments, and take or cause to be taken all such other ac'    shall be reasonably necessary from time to time to give full effect to the Loan Documents and the transactio    ntemplated thereby.

6.    NEGATIVE COVENANTS.  Borrower    nts with, and represents and warrants to, Lender that, from and after the execution date hereof until the Obligations    d and satisfied in full:

    (a)    Merger; Disposition of Assets,    ower shall not (a) change its capital structure, (b) merge or consolidate with any entity, (c) amend or change    ticles of incorporation and code of regulations or by-laws or (d) sell, lease, transfer or otherwise dispose of, c    t any person an option to acquire, or sell and leaseback, all or any substantial portion of its assets, wheth    o owned or hereafter acquired, except for bona fide sales of Inventory in the ordinary course of business and    sitions of property which is obsolete and not used or useful in its business.

7.    FINANCIAL COVENANTS.  Borrower    ender hereby agrees as follows:

    (a)    Debt Service Coverage Ratio.    ower shall not permit its Debt Service Coverage Ratio, on a consolidated basis, to be less than the following    end of any year during any of the following periods:

| Period | Min. Ratio |
|---|---|
| 01/01/2007 and thereafter | 1.25 to 1.0 |

    (b)    Minimum Tangible Capital E    At the end of each fiscal year of Borrower during the following time periods, Borrower shall maintain    imum Tangible Capital Base on a consolidated basis of at least the following amounts:

| Period | Min. Amount |
|---|---|
| 01/01/2007 and thereafter | $150,000.00 |

8.    DEFINITIONS.  Certain capitalized t    ave the meanings set forth on any exhibit hereto. In the Security Agreement, if applicable, or any other Loan L    nt. All financial terms used herein but not defined on the exhibits, in the Security Agreement, if applicable, or a    er Loan Document have the meanings given to them by generally accepted accounting principles. All other u    d terms have the meanings given to them in the Uniform Commercial Code as adopted in the state whose law g    is instrument. The following definitions are used herein:

(a) "Debt Service Coverage Rat_ _ns the ratio of (a) the sum of Borrower's net income for a fiscal year before taxes, depreciation, amortiz_ _ents, and interest expense, less distributions, dividends and other extraordinary items to (b) the sum of (i) _ _'s interest expense and rents and (ii) all principal payments with respect to Indebtedness that were paid or _ _ue and payable by all consolidated entities during the period.

(b) "Indebtedness" means (i) all _ _ _ 'except items of capital stock, of capital surplus, of general contingency reserves or of retained earnings, _ _ _ income taxes, and amount attributable to minority interest if any) which in accordance with generally acce_ _ _ ccounting principles would be included in determining total liabilities on a consolidated basis (if Borrower _ _ have a subsidiary) as shown on the liability side of a balance sheet as at the date as of which Indebtedness _ _ determined, (ii) all Indebtedness secured by any mortgage, pledge, lien or conditional sale or other title re_ _ agreement to which any property or asset owned or held is subject, whether or not the Indebtedness sec_ _ ereby shall have been assumed (excluding non-capitalized leases which may amount to title retention ag_ _ _ but including capitalized leases), and (iii) all Indebtedness of others which Borrower or any subsidiary _ _ _ ly or indirectly guaranteed, endorse (otherwise than for collection or deposit in the ordinary course of _ _ _), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or ot_ _ _ acquire, or in respect of which Borrower or any subsidiary has agreed to apply or advance funds (whethe_ _ y of loan, stock purchase, capital contribution or otherwise) or otherwise to become directly or indirectly lial_ _

(c) "Lien" means any security in_ _ nortgage, pledge, assignment, lien or other encumbrance of any kind, including interests of vendors or less_ _ r conditional sale contracts or capital leases.

(d) "Loan Documents" means _ _ I Rate Management Agreements and each and every document or agreement executed by any pa_ _ ng, guarantying or securing any of the Obligations; and "Loan Document" means any one of the Loan _ _ _ _.

(e) "Long Term Debt" means in_ _ es which either by its terms is not payable in full within one year from the date incurred, or the repaymen_ _ nay, at the option of the obligor, be extended for a period of more than one year from the date incurred.

(f) "Obligation(s)" means all loa_ _ nces, indebtedness and each and every other obligation or liability of Borrower owed to each of Lender a_ _ y affiliate of Fifth Third Bancorp, however created, of every kind and description whether now existing _ _ fter arising and whether direct or indirect, primary or as guarantor or surety, absolute or contingent, _ _ _ or unliquidated, matured or unmatured, participated in whole or in part, created by trust agreement, _ _ _ raft, agreement or otherwise, whether or not secured by additional collateral, whether originated with _ _ owed to others and acquired by Lender by purchase, assignment or otherwise, and including, witho_ _ _ion, all loans, advances, indebtedness and each and every obligation or liability arising under the loan doc_ _ _ and all Rate Management Obligations (as defined in the Loan Documents), letters of credit now or her_ _ _ ed by Lender or any affiliate of Fifth Third Bancorp for the benefit of or at the request of Borrower, _ _ ations to perform or forbear from performing acts, and agreements, instruments and documents evid_ _ guarantying, securing or otherwise executed in connection with any of the foregoing, together with _ _ _nts, modifications and restatements thereof, and all expenses and attorneys' fees incurred by L_ _ _ under or any other document, instrument or agreement related to any of the foregoing.

(g) "Subordinated Indebtednes_ _ ebtedness that is subordinated to the Obligations owed to Lender, in a manner satisfactory to Lende_ _ substance.

(h) "Subsidiary" means any co_ _ which Borrower directly or indirectly owns or controls at the time outstanding stock having ordinary _ _ _ _es (not depending on the happening of a contingency) voting power to elect a majority of the board o_ _ s of said corporation.

(i) "Tangible Capital Base" _ _ _ um of the Tangible Net Worth of Borrower, and all Subordinated Indebtedness.

2008121118-16728

(j) "Tangible Net Worth" shall ... al of the capital stock (less treasury stock), paid-in capital surplus, general contingency reserves and ... earnings (deficit) of Borrower and any Subsidiary as determined on a consolidated basis in acc... generally accepted accounting principles after eliminating all inter-company items and all amounts pre... ...able to minority interests, if any, in the stock and surplus of any Subsidiary, minus the following item... ... duplication of deductions), if any, appearing on the consolidated balance sheet of Borrower:

> (i) all deferred char... ... ...ortization, unamortized debt discount and expense and corporate organization expenses);

> (ii) the book amount ... s ... which would be treated as intangibles under generally accepted accounting principles, ... ...ithout limitation, such items as goodwill, trademark applications, trade names, servic... ... ...d names, copyrights, patents, patent applications and licenses, and rights with respect to ... ...g ;

> (iii) the amount by w...ic... ...r...te inventories or aggregate securities appearing on the asset side of such consolidated b...l... ...s ...e. exceed the lower of cost or market value (at the date of such balance sheet) thereof;

> (iv) any write-up in th... ...c...ount of any asset resulting from a revaluation thereof from the book amount entered upon acq... ...n of such asset; and

> (v) Any related part... ...r ...unts receivable. Related parties shall generally include entities with common ownership o... ...en ... with the Borrower, and employees of the Borrower.

(k) "Rate Management Agre... ...m...s any agreement, device or arrangement providing for payments which are related to fluctuatio... ...t...r... rates, exchange rates, forward rates, or equity prices, including, but not limited to, dollar-denom... ...cr...ss-currency interest rate exchange agreements, forward currency exchange agreements, interest ...r... ...p... collar protection agreements, forward rate currency or interest rate options, puts and warrants, ... ...y ...r...eement pertaining to equity derivative transactions (e.g., equity or equity index swaps, options, ca... ...t...llars and forwards), including without limitation any ISDA Master Agreement between Borrower an... ...er o... any affiliate of Fifth Third Bancorp, and any schedules, confirmations and documents and othe... ...min... evidence between the parties confirming transactions thereunder, all whether now existing o... ...rt...rising, and in each case as amended, modified or supplemented from time to time.

(l) "Rate Management Obl... ...m...s any and all obligations of Borrower to Lender or any affiliate of Fifth Third Bancorp, whether ...o ...c..., ...tingent or otherwise and howsoever and whensoever (whether now or hereafter) created, aris... ...ic... ...d or acquired (including all renewals, extensions and modifications thereof and substitutions the... ...r or in connection with (i) any and all Rate Management Agreements, and (ii) any and all cancella... ...t...y ...cks, reversals, terminations or assignments of any Rate Management Agreement.

9. **EVENTS OF DEFAULT.** Upon ...c...r...ce of any of the following events (each, an "Event of Default"), Lender may, at its option, without any d... ...r n...c... whatsoever, declare this Note and all Obligations to be fully due and payable in their aggregate amount, ... ...wi... ...ccrued interest and all prepayment premiums, fees, and charges applicable thereto:

> (a) Any failure to make any ...t w... due of principal or accrued interest on this Note or any other Obligation and such nonpayment re... ...a...l... for 10 days after written notice from Lender to Borrower of such default.

> (b) Any representation or ... ...y o... Borrower set forth in this Note or in any agreement, instrument, document, certificate or financ... ...me... evidencing, guarantying, securing or otherwise related to, this Note or any other Obligation shall be m... ...i... ...urate or misleading.

(c)    Borrower shall fail to obs... perfor... any other material term or condition of this Note or any other term or condition set forth in any ...ent, ...strument, document, certificate or financial statement evidencing, guarantying or otherwise rel... this N... e or any other Obligation, or Borrower shall otherwise default in the observance or performance coven... nt or agreement set forth in any of the foregoing for 30 days after written notice from Lender to Bo... of such default.

(d)    The dissolution of Borro... ...f any e... dorser or guarantor of the Obligations, or the merger or consolidation of any of the foregoing with a ...arty, o... he lease, sale or other conveyance of a material part of the assets or business of any of the foreg... a third party outside the ordinary course of its business, or the lease, purchase or other acquisition of a ...n... ...l part ...f the assets or business of a third party by any of the foregoing.

(e)    The creation of any Li... ...ept a... ...n to Lender) on, the institution of any garnishment proceedings by attachment, levy or otherw... ...inst, th... ...entry of a judgment against, or the seizure of, any of the property of Borrower or any endorser or g... ...r herec... ...ncluding, without limitation, any property deposited with Lender.

(f)    In the reasonable judgm... ... Lender ... n good faith, any material adverse change occurs in the existing or prospective financial conditio... ...Borrow... that will affect the ability of Borrower to repay the Obligations.

(g)    A commencement by th... ...rower ... f a voluntary case under any applicable bankruptcy, insolvency or other similar law now or ... n effec... or the entry of a decree or order for relief in respect of the Borrower in a case under any such ... appoi... ...ng a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of th... ...ower, c... for any substantial part of the property of Borrower, or ordering the wind-up or liquidation of th... ...s of B... ...ower; or the filing and pendency for 30 days without dismissal of a petition initiating an invol... ...se und... ...any such bankruptcy, insolvency or similar law; or the making by Borrower of any general assig... for the ...enefit of creditors; or the failure of the Borrower of the Obligations generally to pay its debts as... debts t... ...come due; or the taking of action by the Borrower in furtherance of any of the foregoing.

(h)    Nonpayment by the Borro... ...f any R... e Management Obligation relating to this Note when due or the breach by the Borrower of any term, ...on or c... ...dition contained in any Rate Management Agreement.

10.    REMEDIES.    After the occurrenc... ... Even... f Default, in addition to any other remedy permitted by law, Lender may at any time, without notice, apply ... ...ateral ... ...his Note or such other Obligations, whether due or not, and Lender may, at its option, proceed to enforce ...rotect i... rights by an action at law or in equity or by any other appropriate proceedings; provided that this Note an... Obligat... ...ns shall be accelerated automatically and immediately if the Event of Default is a filing under the Bankruptcy ...

Lender's rights and remedies hereunder are cumula... ...nd may... be exercised together, separately, and in any order.    No delay on the part of Lender in the exercise of any ... right o... ...emedy shall operate as a waiver.    No single or partial exercise by Lender of any right or remedy shall pre... ...ny oth... further exercise of it or the exercise of any other right or remedy.    No waiver or indulgence by Lender of a... ...nt of ... ...fault shall be effective unless in writing and signed by Lender, nor shall a waiver on one occasion be cons... s a wa... ...er of any other occurrence in the future.

11.    LATE PAYMENTS; DEFAULT ... FEES... f any payment is not paid when due (whether by acceleration or otherwise) or within 10 days the... under ...ned agrees to pay to Lender a late payment fee as provided for in any loan agreement or 5% of the ... ...nt amo... ...t, whichever is greater with a minimum fee of $20.00. After an Event of Default, Borrower agrees to pay ... ...er a fix... charge of $25.00, or Borrower agrees that Lender may, without notice, increase the Interest Rate by thre... ...centage ...oints (3%) (the "Default Rate"), whichever is greater. Lender may impose a non-sufficient funds fee for a... ...ck tha... ...presented for payment that is returned for any reason, In addition, Lender may charge loan documentation ...s may ... ...e reasonably determined by the Lender.

20081218-16728

12. PREPAYMENT. Borrower may p⸱⸱⸱ ⸱l or pa⸱ ⸱f this Note, which prepaid amounts shall be applied to the amounts due in reverse order of their due dat⸱ ⸱⸱on any ⸱ch prepayment, including involuntary prepayment by acceleration, Borrower shall pay, to Lender a premiu⸱ ⸱.0% of ⸱ amount of such principal prepayment.

13. ENTIRE AGREEMENT. Borrower a ⸱s that ⸱ ⸱re are no conditions or understandings which are not expressed in this Note and the documents referred to ⸱ ⸱n.

14. SEVERABILITY. The declaration c⸱ ⸱lidity of ⸱y provision of this Note shall not affect any part of the remainder of the provisions.

15. ASSIGNMENT. Borrower agrees ⸱to ass⸱ ⸱ any of Borrower's rights, remedies or obligations⸱ described in this Note without the prior written conse⸱ ⸱ender. ⸱orrower agrees that Lender may assign some or all of its rights and remedies described in this Note without ⸱ ⸱ to, or ⸱r consent from, the Borrower.

16. MODIFICATION; WAIVER OF LEN⸱ ⸱ The ⸱ ⸱ification or waiver of any of Borrower's obligations or Lender's rights under this Note must be contained ⸱ ⸱ writi⸱ ⸱igned by Lender. Lender may perform Borrower's obligations, or delay or fail to exercise any of its rights ⸱ emedie ⸱ithout causing a waiver of those obligations or rights. A waiver on one occasion shall not constitute a waiver ⸱ anothe ⸱ccasion. Borrower's obligations under this Note shall not be affected if Lender amends, compromises, exch⸱ ⸱s, fails ⸱ exercise, impairs or releases (i) any of the obligations belonging to any co- borrower, endorser or guaranto⸱ ⸱r (ii) a ⸱ of its rights against any co- borrower, guarantor or endorser.

17. WAIVER OF BORROWER. Demand. ⸱senin⸱ ⸱, protest and notice of dishonor, notice of protest and notice of default are hereby waived by Borrower, and ⸱ ⸱endor⸱ ⸱or guarantor hereof. Each of Borrower, including but not limited to all co-makers and accommodation make⸱ ⸱f this ⸱ hereby waives all suretyship defenses including but not limited to all defenses based upon impairment of ⸱ ⸱ateral ⸱ all suretyship defenses described in Section 3-605 (i) of the Uniform Commercial Code (the "UCC"). Such wa⸱ ⸱s ente ⸱ to the full extent permitted by Section 3-605 (i) of the UCC.

18. GOVERNING LAW; CONSENT TO ⸱RISDI⸱ ⸱ON. This Note is delivered in, is intended to be performed in, will be construed and enforceable in a⸱ ⸱dance ⸱h and governed by the internal laws of, the State of Illinois, without regard to principles of conflicts of law. ⸱orrowe⸱ ⸱grees that the state and federal courts in the County where the Lender is located shall have exclusive juris⸱ ⸱ion ov⸱ ⸱ll matters arising out of this Note, and that service of process in any such proceeding shall be effective if mai⸱ ⸱o Bor⸱ ⸱r at the address set forth herein.

19. JURY WAIVER. BORROWER, AND AN⸱ ⸱NDOR⸱ ⸱R OR GUARANTOR HEREOF, WAIVE THE RIGHT TO A TRIAL BY JURY OF ANY MATTERS ARISING OUT OF T⸱ ⸱OTE ⸱ ⸱HE TRANSACTIONS CONTEMPLATED HEREBY.

20. WARRANT OF ATTORNEY. Borrowe⸱ ⸱uthoriz⸱ ⸱ny attorney of record to appear for it in any court of record in the State of Illinois, after maturity of this Note ⸱ ⸱nether ⸱ ⸱s terms or upon default, acceleration or otherwise, to waive the issuance and service of process, and releas⸱ ⸱ errors⸱ ⸱d to confess judgment against it in favor of Lender for the principal sum due herein together with interest, c⸱ ⸱es, co⸱ ⸱ costs and attorneys' fees. Stay of execution and all exemptions are hereby waived. If this Note or any Ob⸱ ⸱ion is ⸱ ⸱rred to an attorney for collection, and the payment is obtained without the entry of a judgment, the obligors s⸱ ⸱ pay t⸱ ⸱ holder of such obligations its attorneys' fees. EACH OF BORROWER AND ANY ENDORSER OR ANY GU⸱ ⸱NTOI⸱ ⸱REES TH⸱T AN ATTORNEY WHO IS COUNSEL TO LENDER OR ANY OTHER HOLDER OF SUCH OBI⸱ ⸱ATIO⸱ ⸱AY ALSO ACT AS ATTORNEY OF RECORD FOR BORROWER WHEN TAKING THE ACTIONS DESC⸱ ⸱ED A⸱ ⸱/E IN THIS PARAGRAPH. BORROWER AGREES THAT ANY ATTORNEY TAKING SUCH ACTIONS MA⸱ ⸱ PAI⸱ ⸱R THOSE SERVICES BY LENDER OR HOLDER OF SUCH OBLIGATION. BORROWER WAIVES ANY CO⸱ ⸱ICT C⸱ ⸱NTEREST THAT MAY BE CREATED BECAUSE THE ATTORNEY REPRESENTING THE BORROWER ⸱ ⸱BEING ⸱AID BY LENDER OR THE HOLDER OF SUCH OBLIGATION.

BO       )WER:

MC       ervices, Inc., an Illinois corporation

By
(Au      ized Signer)

Chri     ie F. Kraft, President
(Pri     ame and Title)



023 - FTCH

# 𝕱 Fifth Third Bank

## Security Agreement

This Security Agreement (the "Agreement") is made as of July 3, 2007 by MCK Services, Inc., an Illinois corporation located at 575 North Henderson Road, Freeport, Stephenson County, Illinois 61032, (the "Debtor") in favor of Fifth Third Bank, a Michigan banking corporation located at 222 South Riverside Plaza, Chicago, Cook County, Illinois 60606 for itself and as agent for any affiliate of Fifth Third Bancorp (the "Secured Party"). Debtor and Secured Party hereby agree as follows:

### WITNESSETH:

WHEREAS, Debtor is indebted to Secured Party in the aggregate principal amount of Eight Hundred Forty Thousand and 00/100 Dollars ($840,000.00) pursuant to the Revolving Note, dated July 3, 2007, executed by Debtor and made payable to the order of Secured Party, in the principal amount of $800,000.00 and the Term Note, dated July 3, 2007, executed by Debtor and made payable to the order of Secured Party, in the principal amount of $40,000.00 (collectively, the "Notes"), and all agreements, instruments and documents executed or delivered in connection with any of the foregoing or otherwise related thereto (collectively, together with any amendments, modifications, or restatements thereof, the "Loan Documents").

1.    OBLIGATIONS.  This assignment of collateral and grant of security interest shall secure all loans, advances, indebtedness and each and every other obligation or liability of Debtor owed to Secured Party and any affiliate of Fifth Third Bancorp, however created, of every kind and description, whether now existing or hereafter arising and whether direct or indirect, primary or as guarantor or surety, absolute or contingent, due or to become due, liquidated or unliquidated, matured or unmatured, participated in whole or in part, created by trust agreement, lease, overdraft, agreement, or otherwise, whether or not secured by additional collateral, whether originated with Secured Party or owed to others and acquired by Secured Party by purchase, assignment or otherwise, and including, without limitation, all loans, advances, indebtedness and each and every other obligation or liability arising under the Loan Documents, letters of credit now or hereafter issued by Secured Party or any affiliate of Fifth Third Bancorp for the benefit of or at the request of Debtor, all obligations to perform or forbear from performing acts, any and all Rate Management Obligations (as defined in the Loan Documents), and all agreements, instruments and documents evidencing, guarantying, securing or otherwise executed in connection with any of the foregoing, together with any amendments, modifications, and restatements thereof, and all expenses and attorneys' fees incurred or other sums disbursed by Secured Party under this Agreement or any other document, instrument or agreement related to any of the foregoing (collectively, the "Obligations").

2.    COLLATERAL.  The Debtor hereby grants to Secured Party a security interest in all right, title and interest of Debtor in the collateral now existing and hereafter arising or acquired by Debtor, regardless of where it is located, and defined as follows (together with all proceeds and products thereof and all additions and accessions thereto, replacements thereof, supporting obligations therefor, software related thereto, guaranties thereof, insurance or condemnation proceeds thereof, documents related thereto, all sales of accounts constituting a right to payment therefrom, all tort or other claims against third parties arising out of damage thereto or destruction thereof, all property received wholly or partly in trade or exchange therefor, all fixtures attached or appurtenant thereto, all leases thereof, and all rents, revenues, issues, profits and proceeds arising from the sale, lease, license, encumbrance, collection, or any other temporary or permanent disposition thereof, or any other interest therein, collectively, the "Collateral"):

(a)    All Accounts, all Inventory, all Equipment, all General Intangibles, all Investment Property.

(b)    All instruments, chattel paper, electronic chattel paper, documents, securities, moneys, cash, letters of credit, letter of credit rights, promissory notes, warrants, dividends, distributions, contracts, agreements, contract rights or other property, owned by Debtor or in which Debtor has an interest, including but not limited to, those which now or hereafter are in the possession or control of Secured Party or in transit by mail or carrier to or in the possession of any third party acting on behalf of Secured Party, without regard to whether Secured Party received the same in pledge, for safekeeping, as agent for collection or transmission or otherwise or whether Secured Party had conditionally released the same, and the proceeds thereof, all rights to payment from, and all



EXHIBIT
C
63436-1-3-T.WHIT

20081218-16727

claims against Secured Party, and any deposit accounts of Debtor with Secured Party, including all demand, time, savings, passbook or other accounts and all deposits therein.

(c)    All assets and all personal property now owned or hereafter acquired;  all now owned and hereafter acquired inventory, equipment, fixtures, goods, accounts, chattel paper, documents, instruments, farm products, general intangibles, supporting obligations, software, commercial tort claims, minerals, standing timber, growing crops and all rents, issues, profits, products and proceeds thereof, wherever any of the foregoing is located.

3.    DEFINITIONS.  Capitalized terms not otherwise defined in this Agreement shall have the meanings attributed thereto in the applicable version of the Uniform Commercial Code adopted in the jurisdiction in which Debtor is organized or, where appropriate, the jurisdiction in which the Collateral is located, as such definitions may be enlarged or expanded from time to time by legislative amendment thereto or judicial decision (the "Uniform Commercial Code"). As used herein, the following capitalized terms shall have the following meanings:

(a)    "Accounts" means all accounts, accounts receivable, health-care insurance receivables, credit card receivables, contract rights, instruments, documents, chattel paper, tax refunds from federal, state or local governments and all obligations in any form including without limitation those arising out of the sale or lease of goods or the rendition of services by Debtor; all guaranties, letters of credit and other security and support obligations for any of the above; all merchandise returned to or reclaimed by Debtor; and all books and records (including computer programs, tapes and data processing software) evidencing an interest in or relating to the above; all winnings in a lottery or other game of chance operated by a governmental unit or person licensed to operate such game by a governmental unit and all rights to payment therefrom; and all "Accounts" as same is now or hereinafter defined in the Uniform Commercial Code.

(b)    "Equipment" means all goods (excluding inventory, farm products or consumer goods), all machinery, machine tools, equipment, fixtures, office equipment, furniture, furnishings, motors, motor vehicles, tools, dies, parts, jigs, goods (including, without limitation, each of the items of equipment set forth on any schedule which is either now or in the future attached to Secured Party's copy of this Agreement), and all attachments, accessories, accessions, replacements, substitutions, additions and improvements thereto, all supplies used or useful in connection therewith, and all "Equipment" as same is now or hereinafter defined in the Uniform Commercial Code.

(c)    "General Intangibles" means all general intangibles, choses in action, causes of action, obligations or indebtedness owed to Debtor from any source whatsoever, payment intangibles, software and all other intangible personal property of every kind and nature (other than Accounts) including without limitation patents, trademarks, trade names, service marks, copyrights and applications for any of the above, and goodwill, trade secrets, licenses, franchises, rights under agreements, tax refund claims, and all books and records including all computer programs, disks, tapes, printouts, customer lists, credit files and other business and financial records, the equipment containing any such information, and all "General Intangibles" as same is now or hereinafter defined in the Uniform Commercial Code.

(d)    "Inventory" means goods, supplies, wares, merchandises and other tangible personal property, including raw materials, work in process, supplies and components, and finished goods, whether held for sale or lease, or furnished or to be furnished under any contract for service, or used or consumed in business, and also including products of and accessions to inventory, packing and shipping materials, all documents of title, whether negotiable or non-negotiable, representing any of the foregoing, and all "Inventory" as same is now or hereinafter defined in the Uniform Commercial Code.

(e)    "Investment Property" means a security, whether certificated or uncertificated, security entitlement, securities account, commodity contract or commodity account and all "Investment Property" as same is now or hereafter defined in the Uniform Commercial Code.

4.    <u>WARRANTIES AS TO DEBTOR.</u> Debtor hereby represents and warrants to Secured Party as follows:

(a)    It is an Illinois corporation with a principal place of business located at the address otherwise set forth herein, and is duly organized, validly existing and in good standing under the laws of the State of Illinois.

(b)    Debtor further warrants that its exact legal name is set forth in the initial paragraph of this Agreement, and that its Taxpayer I.D. is 43-2115525, and that its Organizational No. is 65369575.

(c)    Exhibit A, attached to this Agreement and incorporated herein by reference, lists the location of any and all of the Collateral of Debtor.

5.    <u>WARRANTIES AS TO THE COLLATERAL.</u> Debtor hereby represents and warrants to Secured Party that:

(a)    Except for the security interest hereby granted, Debtor is, and as to any property which at any time forms a part of the Collateral, shall be, the sole owner of, with good and marketable title in, each and every item of the Collateral, or otherwise shall have the full right and power to grant a security interest in the Collateral, free from any lien, security interest or encumbrance whatsoever;

(b)    Each item of Collateral is, and shall be, valid, and all information furnished to Secured Party with regard thereto is, and shall be, accurate and correct in all respects when furnished;

(c)    None of the Collateral shall be sold, assigned, transferred, discounted, hypothecated or otherwise subjected to any lien, encumbrance or security interest, and Debtor shall defend such Collateral and each and every part thereof against all claims of all persons at any time claiming such Collateral or claiming any interest therein adverse to Secured Party;

(d)    The provisions of this Agreement are sufficient to create in favor of Secured Party a valid and continuing lien on, and first security interest in, the types of Collateral in which a security interest may be perfected by the filing of UCC Financing Statements, and when such UCC Financing Statements are filed in the appropriate filing offices, and the requisite filing fees are paid, such filings shall be sufficient to perfect such security interests (other than Equipment affixed to real property so as to become fixtures);

(e)    If any of the Collateral is or will be attached to real estate in such a manner as to become a fixture under applicable state law, that said real estate is not encumbered in any way, or if said real estate is encumbered, Debtor will secure from the lien holder or the party in whose favor it is or will become so encumbered a written acknowledgment and subordination to the security interest hereby granted in such form as is acceptable to Secured Party;

(f)    The financial statements of Debtor for the most recent ended fiscal period and heretofore submitted, to the Secured Party are true and correct and there are no material adverse changes in the conditions, financial or otherwise, of Debtor since the date of said financial statements.

6.    <u>DEBTOR'S RESPONSIBILITIES.</u> Debtor covenants with, and warrants to, Secured Party that Debtor shall:

(a)    Furnish to Secured Party, in writing, a current list of all Collateral for the purpose of identifying the Collateral and, further, execute and deliver such supplemental instruments, documents, agreements and chattel paper, in the form of assignments or otherwise, as Secured Party shall require for the purpose of confirming and perfecting, and continuing the perfection of, Secured Party's security interest in any or all of such Collateral, or as is necessary to provide Secured Party with control over the Collateral or any portion thereof;

(b)    At its expense and upon request of Secured Party, furnish copies of invoices issued by Debtor in connection with the Collateral, furnish certificates of insurance evidencing insurance on Collateral, furnish proof of payment of taxes and assessments on Collateral, make available to Secured Party, any and all of Debtor's books,

20081218-167217

records, written memoranda, correspondence, purchase orders, invoices and other instruments or writings that in any way evidence or relate to the Collateral;

(c)     Keep the Collateral insured at all times against risks of loss or damage by fire (including so-called extended coverage), theft and such other casualties including collision in the case of any motor vehicle, all in such amounts, under such forms of policies, upon such terms, for such periods and written by such companies or underwriters as is satisfactory to Secured Party.  In all cases losses shall be payable to Secured Party and any surplusage shall be paid to Debtor. All policies of insurance shall provide for at least thirty (30) days prior written notice of cancellation to Secured Party.  Should Debtor at any time fail to purchase or maintain insurance, pay taxes, or pay for any expense, incident or such insurance, pay such taxes, order, and pay for such necessary items of preservation, maintenance or protection, and Debtor agrees to reimburse Secured Party for all expenses incurred under this paragraph;

(d)     Pay all taxes or assessments imposed on or with respect to the Collateral;

(e)     Keep all of the Collateral in good condition and repair, protecting it from weather and other contingencies which might adversely affect it as secured hereunder;

(f)     Notify Secured Party immediately in writing of any information which Debtor has or may receive which might in any way adversely affect the value of the Collateral or the rights of Secured Party with respect thereto;

(g)     Notify Secured Party promptly, in writing, of any change in the Debtor's exact legal name or any change in the location of the Collateral or of any place of business or mailing addresses or the establishment of any new place of business or mailing address;

(h)     Pay all costs of filing any financing, continuation or termination statements with respect to the security interest created hereby;

(i)     Upon the occurrence of an Event of Default or breach of any provision of this Security Agreement, pay all expenses and reasonable attorneys' fees of Secured Party; and Debtor agrees that said expenses and fees shall be secured under this Agreement;

(j)     Maintain possession of all Collateral at the location disclosed to Secured Party and not to remove the Collateral from that location;

(k)     Not sell, contract to sell, lease, encumber, or otherwise transfer the Collateral (other than inventory) until the Obligations have been paid and performed, Debtor acknowledging nonetheless that Secured Party has a security interest in the proceeds of such Collateral;

(l)     Take any other and further action necessary or desirable as requested by Secured Party to grant Secured Party control over the Collateral, as "control" is defined in the applicable version of the Uniform Commercial Code, including without limitation (i) executing and/or authenticating any assignments or third party agreements; (ii) delivering, or causing the delivery of, any of the Collateral to the possession of Secured Party; or (iii) obtaining written acknowledgements of the lien of Secured Party and agreements of subordination to such lien from third parties in possession of the Collateral in a form acceptable to Secured Party.  Debtor consents to and hereby authorizes any third party in an authenticated record or agreement between Debtor, Secured Party, and the third party, including but not limited to depository institutions, securities intermediaries, and issuers of letters of credit or other support obligations, to accept direction from Secured Party regarding the maintenance and disposition of the Collateral and the products and proceeds thereof, and to enter into agreements with Secured Party regarding same, without further consent of the Debtor.

7.    ACCOUNTS RECEIVABLE. Debtor hereby agrees that, notwithstanding the fact that all or any part of the Obligations is not matured and Debtor is current in payment according to the tenor of the Obligations, Secured Party shall have the absolute right to take any one or all of the following actions:

(a)    Secured Party may serve written notice on Debtor instructing Debtor to deliver to Secured Party all subsequent payments on accounts receivable which Debtor shall do until notified otherwise;

(b)    Secured Party may notify the account debtor(s) of its security interest and instruct such account debtor(s) to make further payments on such accounts to Secured Party instead of to Debtor; and,

(c)    Secured Party may serve written notice upon Debtor that all subsequent billings or statements of account rendered to any account debtor shall bear a notation directing the account debtor(s) to make payment directly to Secured Party. Any payment received by Secured Party pursuant to this paragraph shall be retained in a separate non-interest bearing account as security for the payment and performance of all Obligations of Debtor.

8.    POWER OF ATTORNEY. Debtor hereby makes, constitutes and appoints Secured Party its true and lawful attorney in fact to act, with full power of substitution, with respect to the Collateral in any transaction, legal proceeding, or other matter in which Secured Party is acting pursuant to this Agreement, including but not limited to executing, authenticating and/or filing on its behalf: (i) UCC Financing Statements and amendments thereto reflecting the lien of Secured Party upon the Collateral and any other documents necessary or desirable to perfect or otherwise continue the security interest granted herein; and (ii) any third party agreements or assignments to grant Secured Party control over the Collateral, including but not limited to third party agreements between Debtor, Secured Party, and depository institutions, securities intermediaries, and issuers of letters of credit or other support obligations, which third party agreements direct the third party to accept direction from Secured Party regarding the maintenance and disposition of the Collateral and the products and proceeds thereof.

9.    EVENTS OF DEFAULT. Any of the following events shall be an "Event of Default" hereunder:

(a)    An event of default occurs under any agreement, instrument or document evidencing, guarantying, securing or otherwise executed or delivered in connection with any of the Obligations, as "Event of Default" shall be defined therein.

(b)    Any representation or warranty of Debtor set forth in this Agreement or in any agreement, instrument, document, certificate or financial statement evidencing, guarantying, securing or otherwise related to, this Agreement or any other Obligation shall be materially inaccurate or misleading.

(c)    Debtor shall fail to maintain in force the insurance required in this Agreement or in any agreement, instrument, document, certificate or financial statement evidencing, guarantying, securing or otherwise related to, this Agreement or any other Obligation, or Debtor shall otherwise default in the observance or performance of any covenant or agreement set forth in any of the foregoing for a period of 30 days.

10.    REMEDIES. Upon the occurrence and until the waiver of an Event of Default, Secured Party may, without further notice to Debtor, at Secured Party's option, declare any note and all of the Obligations to become due and payable in its aggregate amount; provided that the Obligations shall be accelerated automatically and immediately if the Event of Default is a filing under the Bankruptcy Code. Secured Party may resort to the rights and remedies of a secured party under the Uniform Commercial Code, including but not limited to the right of a secured party to (a) enter any premises of Debtor, with or without legal process and take possession of the Collateral and remove it and any records pertaining thereto and/or remain on such premises and use it for the purpose of collecting, preparing and disposing of the Collateral; (b) ship, reclaim, recover, store, finish, maintain and repair the Collateral; and (c) sell the Collateral at public or private sale. Debtor will be credited with the net proceeds of any such sale only when they are actually received by Secured Party, and any requirement of reasonable notice of any disposition of the Collateral will be satisfied without notice to Debtor if the Collateral is of a type customarily sold on a recognized market or otherwise if such notice is sent to Debtor 10 days prior to such disposition. Debtor will, upon request, assemble the Collateral and any records pertaining thereto and make them available at a place designated by Secured Party. Secured Party may use, in connection with any assembly or disposition of the Collateral, any trademark, tradename, tradestyle, copyright, patent right, trade secret or technical process used or

utilized by Debtor. No remedy set forth herein is exclusive of any other available remedy or remedies, but each is cumulative and in addition to every other remedy given under this Agreement, any of the Obligations, or now or hereafter existing at law or in equity or by statute. Secured Party may proceed to protect and enforce its rights by an action at law, in equity or by any other appropriate proceedings. No failure on the part of Secured Party to enforce any of the rights hereunder shall be deemed a waiver of such rights or of any Event of Default and no waiver of any Event of Default shall be deemed to be a waiver of any subsequent Event of Default.

11.    MISCELLANEOUS PROVISIONS.

(a)    All rights of Secured Party shall inure to the benefit of its successors and assigns and all obligations of Debtor shall bind the heirs, executors, administrators, successors and assigns of Debtor.

(b)    Debtor acknowledges and agrees that, in addition to the security interests granted herein, Secured Party has a banker's lien and common law right of set-off in and to Debtor's deposits, accounts and credits held by Secured Party and Secured Party may apply or set-off such deposits or other sums against the Obligations upon the occurrence of an Event of Default as set forth in this Agreement.

(c)    This Agreement contains the entire Agreement of the parties and no oral Agreement whatsoever, whether made contemporaneously herewith or hereafter shall amend, modify or otherwise affect the terms of this Agreement.

(d)    All rights and liabilities hereunder shall be governed and limited by, and construed in accordance with, the laws of the State in which Debtor is organized.

(e)    Any provision herein which may prove limited or unenforceable under any law or judicial ruling shall not affect the validity or enforceability of the remainder of this Agreement.

(f)    Debtor hereby authorizes Secured Party to file a copy of this Agreement as a Financing Statement with appropriate county and state government authorities necessary to perfect Secured Party's security interest in the Collateral as set forth herein. Debtor hereby further authorizes Secured Party to file UCC Financing Statements on behalf of Debtor and Secured Party with respect to the Collateral.

SECURED PARTY:                                         DEBTOR:

Fifth Third Bank, a Michigan banking corporation        MCK Services, Inc., an Illinois corporation

By: _Andrea Moring_____                          By: _Christine F. Kraft_____
(Signature)                                            (Authorized Signer)

_Andrea Moring, AVP_____                            Christine F. Kraft, President
(Print Name and Title)                                 (Print Name and Title)

20081218-16727

EXHIBIT A

Collateral Locations

575 North Henderson Road, Stephenson County, Freeport, IL 61032

# CSC Diligenz®

*Web-Based Due Diligence Services*

8500 Harbour Heights Pkwy
Suite 400
Mukilteo, WA  98275-4889

Ph: (800) 858-5294
Fx: (800) 345-6059

## *UCC Summary Report*

Order Number: 37721863
Search Date: 10/16/2008
Account Number: 352200
Ref: PT-2355
Subject: MCK Services, Inc.
Search Criteria: MCK Services, Inc.

Total Records Found: 1

Results for Illinois UCC Search By Company Name - Lapsed

Current as of: 10/10/2008

| GroupID | Filing Number | Category | Filing Date | Exp Date | Debtor Name | Secured Party |
|---------|---------------|----------|-------------|----------|-------------|---------------|
| 0001.001 | 012295693 | UCC1 | 7/12/2007 | 7/12/2012 | MCK SERVICES, INC.<br>675 NORTH HENDERSON ROAD<br>FREEPORT, IL  610320000 | FIFTH THIRD BANK<br>222 SOUTH RIVERSIDE PLAZA<br>1MOC2A<br>CHICAGO, IL  606060000 |

*End of Report*



EXHIBIT
D

This data is for informational purposes only. Certification can only be obtained through the appropriate state, county, local, court or jurisdictional office. Please review actual copies to verify information. We take great care in providing you with the most accurate and up to date public record information available. However, responsibility for maintaining public records rests with the filing office of the jurisdiction, and we will accept no liability for errors or omissions in this report.

20081218-16729

RECEIVED
IL SECRETARY OF STATE
UNIFORM COMMERCIAL CODE
20070712    1424
$20.00    Electronic

12295693                    FS

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Diligenz                              (800)858-5294

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Diligenz, Inc.

6500 Harbour Heights Pkwy #400

Mukilteo, WA, 98275

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| **1a. ORGANIZATION'S NAME** MCK SERVICES, INC. | | | | |
| **1b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | | SUFFIX |
| **1c. MAILING ADDRESS** 575 NORTH HENDERSON ROAD | CITY FREEPORT | STATE IL | POSTAL CODE 61032 | COUNTRY USA |
| **1d. SEE INSTRUCTIONS** ADD'L INFO RE ORGANIZATION DEBTOR | **1e. TYPE OF ORGANIZATION** CORPORATION | **1f. JURISDICTION OF ORGANIZATION** IL | **1g. ORGANIZATION ID #, if any** 65369575 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | | |
| **2b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | | SUFFIX |
| **2c. MAILING ADDRESS** | CITY | STATE | POSTAL CODE | COUNTRY |
| **2d. SEE INSTRUCTIONS** ADD'L INFO RE ORGANIZATION DEBTOR | **2e. TYPE OF ORGANIZATION** | **2f. JURISDICTION OF ORGANIZATION** | **2g. ORGANIZATION ID #, if any** | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| **3a. ORGANIZATION'S NAME** FIFTH THIRD BANK | | | | |
| **3b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | | SUFFIX |
| **3c. MAILING ADDRESS** 222 SOUTH RIVERSIDE PLAZA 1MOC2A | CITY CHICAGO | STATE IL | POSTAL CODE 60606 | COUNTRY USA |

**4. This FINANCING STATEMENT covers the following collateral:**

ALL ASSETS AND ALL PERSONAL PROPERTY NOW OWNED AND HEREAFTER ACQUIRED, ALL NOW OWNED AND HEREAFTER ACQUIRED INVENTORY, EQUIPMENT, FIXTURES, GOODS, ACCOUNTS, CHATTEL PAPER, DOCUMENTS, INSTRUMENTS, FARM PRODUCTS, GENERAL INTANGIBLES, INVESTMENT PROPERTY, DEPOSIT ACCOUNTS, LETTER OF CREDIT RIGHTS, PAYMENT INTANGIBLES, SUPPORTING OBLIGATIONS, SOFTWARE, AND ALL RENTS, ISSUES, PROFITS, PRODUCTS AND PROCEEDS THEREOF, WHEREVER ANY OF THE FOREGOING IS LOCATED.

**5. ALTERNATIVE DESIGNATION [if applicable]:** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

**6.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ☐ ESTATE RECORDS.    Attach Addendum    [if applicable] 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] ☐ ALL DEBTORS ☐ DEBTOR 1 ☐ DEBTOR 2

**8. OPTIONAL FILER REFERENCE DATA**

23-2527 - MCK SERVICES, INC. [27636531]

FILING OFFICE COPY - UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)


EXHIBIT
E
tabbies